## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

In re:

BIOPURE CORPORATION,

    Debtor.

Chapter 11
Case No. 09-_____-___

### MOTION OF DEBTOR FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES; (B) AUTHORIZING AND SCHEDULING AN AUCTION; (C) APPROVING PAYMENT OF AN EXPENSE REIMBURSEMENT; (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (E) SCHEDULING A SALE HEARING; AND (II) AN ORDER OR ORDERS AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED <u>LEASES IN CONNECTION THEREWITH</u>

Biopure Corporation, the debtor and debtor-in-possession (the "Debtor" or the "Company"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and MLBR 2002-1, 2002-5 and 6004-1, respectfully requests entry of:

  (i)  an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "Bidding Procedures Order") (a) approving certain bid procedures, which are attached as <u>Exhibit 1</u> to the Bidding Procedures Order (the "Bid Procedures"), in connection with the sale of substantially all of the Debtors' assets generally described as follows: (1) substantially all of the Debtor's operating assets, excluding the Debtor's fifty percent (50%) general partnership interest in Eleven Hurley Street

Associates (the "EHSA Asset"), avoidance actions, and certain other claims of the

Debtor, all as identified in that certain Asset Purchase Agreement (the "Purchase

Agreement") dated as of July 16, 2009 between OPK Biotech LLC (the "Stalking

Horse Purchaser") and the Debtor (collectively, the "Purchased Assets" and the

sale of such Purchased Assets being referred to herein as the "Purchased Assets

Sale"); and (2) the EHSA Asset (the sale of such EHSA Asset being referred to

herein as the "EHSA Asset Sale"); (b) authorizing and scheduling an auction or

multiple auctions in connection with the Purchased Assets Sale (the "Purchased

Assets Auction") and EHSA Asset Sale (the "EHSA Asset Auction"); (c)

approving the reimbursement of the Stalking Horse Purchaser's documented out-

of-pocket expenses not to exceed $150,000 (the "Expense Reimbursement") in

accordance with the terms and conditions of the Purchase Agreement; (d)

establishing and approving the procedures to determine, and the form and manner

of notice with respect to, the amounts to be paid and actions to be taken to cure

defaults, if any, under the executory contracts (the "Contracts") and unexpired

leases (the "Leases") to be assumed by the Debtor and assigned to the successful

bidder in connection with the Purchased Assets Sale; (e) approving the form and

manner of notice of the proposed Purchased Assets Sale and EHSA Sale, the Bid

Procedures, the Purchased Assets Auction, EHSA Asset Auction and the sale

hearing(s); and (f) scheduling a hearing or hearings to consider approval of the

Purchased Assets Sale and EHSA Asset Sale (the "Sale Hearing");

(ii)     an order, substantially in the form attached hereto as <u>Exhibit B</u> (the "Sale Order")

authorizing and approving (a) the sale of the Purchased Assets to the Stalking

Horse Purchaser, or the person(s) or entity(ies) making an otherwise higher and

better offer at the Purchased Assets Auction, free and clear of liens, claims and

encumbrances, for all of the Purchased Assets; (b) the assumption and assignment

of the Contracts and Leases in connection with the Purchased Assets Sale; and (c)

waiving the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d); and

(iii)    an order authorizing the sale of the EHSA Asset free and clear of liens, claims and

encumbrances in a form to be negotiated with prospective bidders (the "EHSA

Sale Order").

The facts and circumstances supporting the entry of the Bidding Procedures Order, the

Sale Order and the EHSA Sale Order sought by this Motion are set forth in detail below and in

the *Affidavit of Zafiris G. Zafirelis in Support of Chapter 11 Petition and Certain Requests for

Preliminary Relief*.  In further support of this Motion, the Debtor respectfully states as follows:

## **INTRODUCTION**

1.      On July 16, 2009 (the "Petition Date"), the Debtor commenced its chapter 11 case

by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor

continues to manage its business and financial affairs as debtor-in-possession in accordance with

sections 1107 and 1108 of the Bankruptcy Code.  Neither a trustee nor an official committee of

unsecured creditors has been appointed in this case.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to

28 U.S.C. § 157(b)(2).

3.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and MLBR 2002-1, 2002-5 and 6004-1.

## **BACKGROUND**

4.      The Debtor is a publicly-held company.  Its shares of Class A common stock are registered under Section 12(g) of the Securities Exchange Act of 1934 and traded on The Nasdaq Stock Market.

5.      The Company develops pharmaceuticals, called oxygen therapeutics, that are intravenously administered to deliver oxygen to the body's tissues.  Since its founding in 1984, the Company has been primarily a research and development company focused on developing Hemopure®, the Company's oxygen therapeutic for human use, and obtaining regulatory approval in the United States and other markets.  The Company's research and development expenses have been devoted to basic research, product development, process development, preclinical studies, clinical trials and regulatory activity.  In addition, the Company's development expenses in the past included the design, construction, validation and maintenance of a large-scale pilot manufacturing plant in Cambridge, Massachusetts.  In 2003 the Company entered into an agreement with the U.S. Naval Medical Research Center (NMRC) in which the NMRC agreed to develop Hemopure® for use in trauma.

6.      Prior to 1998, the Company manufactured products solely for use in preclinical and clinical trials.  As an offshoot of the research and development for Hemopure®, Oxyglobin®, a similar product, gained marketing approval for veterinary use in the United States in 1998 and in the European Union in 1999.  Following the U.S. approval, Oxyglobin® was produced for sale in the same pilot manufacturing plant that was built and maintained primarily

for the development of Hemopure®.  More than 200,000 units of Oxyglobin® have been sold to

veterinarians.  Marketing approval of Hemopure® for human use was granted in South Africa in

2002.

7.      During fiscal years 2008 and 2009, the Company took measures to reduce its

ongoing cash burn.  In November 2008, it effected reductions in force and shut down its

manufacturing facility in Cambridge and its processing facility in Pennsylvania.  By November

2008, nearly all of its employees had been laid off.  Also in 2008, the Company stopped all of its

then ongoing clinical trials because of slow enrollment and for cost containment.  The Company

has continued limited operations since then.

8.      In January 2009, the Company sold substantially all its existing inventory of

Oxyglobin®.  In March 2009, the Company also sold its manufacturing facility in Pennsylvania

and entered into a lease of the facility from the purchaser.

Events Leading to Debtor's Filing of its Petition for Relief under Chapter 11 of
the Bankruptcy Code

9.      In late April 2008, the Journal of the American Medical Association ("JAMA")

published a so-called meta-analysis of hemoglobin based oxygen carriers.  The analysis included

summary data from Hemopure® trials as well as publicly available data from the trials of four

other products, including abandoned investigational products.  The Company believes the article

to be greatly flawed.  The Company published on its website some of its criticisms of the

methodology and conclusions in the article, but neither the Company's efforts, objections of

other manufacturers in the industry, nor published letters to JAMA by knowledgeable doctors

reversed the adverse perception created by the article.  Further, some of the article's authors sent

letters to regulatory bodies and doctors in the countries where the Company was conducting

clinical trials and in South Africa, where Hemopure® has marketing approval, recommending

that Hemopure® clinical trials be stopped and that the registration of Hemopure® in South Africa be revoked. Subsequently, the South African Department of Health's regulatory body, the Medicines Control Council of South Africa, advised the Company of its decision to discontinue the registration of Hemopure®. The Company is appealing that decision.

10.    Despite diligent efforts, extensive preclinical studies, responsiveness to concerns of the FDA and over $20 million in Congressional appropriations, the U.S. Naval Medical Research Center has been prevented by the FDA from proceeding with a development program to use Hemopure® in war injuries or pre-hospital use in civilian trauma patients.

11.    Sales of Hemopure® in South Africa were increasing before the publication of the article. However, publicity from the JAMA article adversely affected the trend. Most of the Company's South Africa personnel were terminated in November 2008.

12.    In addition, annual losses have existed from operations since the Company's inception. The key drivers of the losses have been cost of revenues, research and development and general and administrative expenses. The Company has not had adequate cash to fund operations since late in fiscal year 2008. At October 31, 2008, the Company had $1,095,000 in cash and cash equivalents. At December 31, 2008, it had $356,000 in cash and cash equivalents. Since October 31, 2008, the Company has drastically reduced operations and collected limited revenue. As of March 25, 2009, the Company anticipated that its cash on hand and expected cash inflows could impact its ability to continue to operate. The Company has not been able to generate sufficient financing to resume full operations and ensure payment of its operating expenses going forward.

13.    In February 2009, the Company retained an investment banker to advise it with respect to strategic alternatives. The Company has been presented to potential investors and

purchasers since that time.  After considering alternatives, the Company entered into the

Purchase Agreement as described above and herein.

## **RELIEF REQUESTED**

14.     By this Motion, the Debtor respectfully requests entry of the Bidding Procedures

Order in substantially the form attached hereto as Exhibit A: (a) approving Bid Procedures in

connection with the Purchased Assets Sale to the Stalking Horse Purchaser and the EHSA Asset

Sale; (b) authorizing and scheduling the Purchased Assets Auction and EHSA Asset Auction; (c)

approving the payment of the Expense Reimbursement to the Stalking Horse Purchaser in

accordance with the terms and conditions of the Purchase Agreement; (d) establishing and

approving the procedures to determine, and the form and manner of notice with respect to, the

amounts to be paid and actions to be taken to cure defaults, if any, under the Contracts and

Leases to be assumed and assigned to the successful bidder in connection with the Purchased

Assets Sale; (e) approving the form and manner of notice of the proposed Purchased Assets Sale,

EHSA Asst Sale, Bid Procedures, Purchased Assets Auction, EHSA Asset Auction and the Sale

Hearing; and (f) scheduling the Sale Hearing.

15.     Following the Purchased Assets Auction and at the Sale Hearing, the Debtor will

seek entry of a Sale Order approving: (a) the sale of the Purchased Assets free and clear of all

Encumbrances (as defined herein) to the Stalking Horse Purchaser or the person(s) or entity(ies)

making an otherwise higher and better offer at the Purchased Assets Auction, substantially in the

form attached hereto as Exhibit C; (b) the assumption and assignment of the Contracts and

Leases in connection with the Purchased Assets Sale; and (c) waiving the ten (10) day stays

under Bankruptcy Rules 6004(h) and 6006(d).

16.     Following the EHSA Asset Auction and at the Sale Hearing, the Debtor may also seek entry of a sale order approving the sale of the EHSA Asset free and clear of all Encumbrances to the successful bidder at the EHSA Asset Auction.

**A.     *The Proposed Sales***

17.     The Debtor has engaged in a process of considering potential sales and restructuring alternatives to develop a plan that would maximize value for its stakeholders and to ensure the Debtor's long-term survival.  After carefully considering its options, and in light of its liquidity constraints and financial deadlines and restrictions, the Debtor has determined that the best course of action to obtain the greatest possible return for its stakeholders is to seek a buyer for the entirety of the Debtor's business as a going concern and evaluate the potential sale of the Debtor's various assets separately.  After lengthy arms' length negotiations, that process resulted in the execution of the Purchase Agreement with the Stalking Horse Purchaser to acquire the Purchased Assets.

18.     The Debtor believes that the floor established by the Purchase Agreement, subject to higher and better bids pursuant to a Bankruptcy Court-approved, open auction process pursuant to section 363 of the Bankruptcy Code, affords the Debtor the best opportunity to maximize value for its creditors and its estate with respect to the Purchased Assets.

19.     In addition, the Debtor believes that a sale of the EHSA Asset by auction may permit the Debtor to realize value for its bankruptcy estate through a potential combined bid that may otherwise be lost if the Debtor retained the EHSA Asset for sale at a later time.

**B.     *The Purchase Agreement with respect to the Purchased Assets***

20.     On July 16, 2009, the Debtor and the Stalking Horse Purchaser entered into the Purchase Agreement pursuant to which the Stalking Horse Purchaser will acquire all of the

Purchased Assets and assume certain liabilities of the Debtor, as more fully set forth in the

Purchase Agreement.  The Purchased Assets are more particularly defined and described in the

Purchase Agreement.  The Purchase Price (as that term is defined in the Purchase Agreement)

agreed to be paid by the Stalking Horse Purchaser for the Purchased Assets is $2,600,000.  The

Debtor shall satisfy any outstanding cure amounts in excess of $25,000, as may be determined by

the parties or the Bankruptcy Court, with respect to the Contracts and Leases, from the proceeds

of the Purchased Assets Sale and either satisfy such cure amounts at Closing (as that term is

defined in the Purchase Agreement) or reserve, in a separate escrow account, sufficient funds,

free and clear of all liens, claims and encumbrances, necessary to satisfy such cure amounts.  The

Debtor does not believe that any substantial cure amounts will be required to be paid at Closing.

21.    Immediately prior to the Petition Date, the Debtor and its professionals were in

active discussion with several parties interested in the Debtor's assets.  The Debtor intends to

continue to aggressively solicit potential purchasers for the Debtor's business and assets in

accordance with the Bid Procedures and the Purchase Agreement.  In light of the Debtor's lack

of liquidity and other financial constraints, the Debtor intends to execute its plan of pursuing the

sale of its business and assets as promptly as practicable, in accordance with the provisions of the

Bankruptcy Code and in a manner that will afford all of the Debtor's economic stakeholders an

opportunity to participate in the process and otherwise maximize the value of the Debtor's assets

for the benefit of all creditors.

22.    The Debtor seeks an expeditious, yet appropriate, schedule whereby the Sale

Hearing may be held and completed within a period of approximately thirty (30) days from the

Petition Date.  This schedule is driven by the Debtor's lack of liquidity and inability to attract

and secure financing for its normal business operations.  Moreover, such a schedule will ensure

the preservation and maximization of the value of the Purchased Assets and EHSA Asset.  The

Purchased Assets have been marketed since February 2009 with several parties having conducted

due diligence in connection with the possible acquisition of the Purchased Assets.

**C.      *Proposed Bid Procedures – MLBR 6004-1 Disclosures***

23.      Although the Debtor has undertaken efforts prior to the Petition Date to market its

business and assets to ensure they are exposed to the broadest pool of possible purchasers and to

ensure the highest possible price is received, the Debtor believes that it is important that it

promptly move forward with the approval and implementation of the Bid Procedures to establish

the procedures for further marketing and competitive bidding.  Accordingly, the Bid Procedures

(as summarized below) were developed consistent with the Debtor's need to expedite the sales

process, but with the objective of promoting active bidding that will result in the highest and best

offer  the marketplace can sustain for the Debtor's assets.  Moreover, the Bid Procedures reflect

the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion that

promotes interest in the Debtor's assets by financially-capable, motivated bidders who are likely

to close a transaction.

24.      The following paragraphs in this section summarize the key provisions of the Bid

Procedures, and are qualified in their entirety by reference to the actual Bid Procedures attached

as Exhibit 1 to the Bidding Procedures Order.

## BID PROCEDURES

### Bidding Process

The Debtor will:

(a)      provide notice as contemplated in the Bidding Procedures Order;

(b)      determine whether any person is a Qualified Bidder (as defined below);

(c)    determine whether a Qualified Bidder has made a Qualified Bid (as defined below); and

(d)    negotiate any offer set forth in a Qualified Bid,

(collectively, the "Bidding Process").

## **Participation Requirements**

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the Bidding Process, each person (a "Potential Bidder) must first deliver to: (i) Biopure Corporation, 11 Hurley Street, Cambridge, MA 02141, bankruptcynotices@biopure.com; and (ii) counsel to the Debtor, Christopher J. Panos, Esq., Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, Boston, MA 02210, panos@craigmacauley.com and krahbany@craigmacauley.com (collectively, the "Notice Parties"), no later than 5:00 p.m. (prevailing Boston, Massachusetts time) on _____, 2009, the following items (the "Participation Requirements"):

(e)    <u>Confidentiality Agreement</u>: An executed confidentiality agreement (unless previously delivered) in form and substance reasonably acceptable to the Debtor; and

(f)    <u>Proof of Financial Ability to Perform</u>: The most current audited and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of making a Bid, the current audited and latest unaudited financial statements of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the proposed sale transaction, the sufficiency of which shall be determined by the Debtor in its discretion.  The Debtor may use its reasonable discretion in consultation with any Creditors Committee that may be appointed to accept or require other information demonstrating financial ability.

## **Access to Due Diligence Materials**

Upon a Potential Bidders' satisfaction of the Participation Requirements such Potential Bidder shall be deemed a "Qualified Bidder."  The Debtor shall afford each Qualified Bidder due diligence access to the Debtor's business and assets, which diligence may include access to a data room, management presentations and site visits, and such other diligence which Potential Bidders may request and to which the Debtor, in its discretion, may agree, <u>provided</u>, <u>however</u>, that the Debtor shall have no obligation to provide due diligence access to any Qualified Bidder after the Bid Deadline (as defined below).

## Bid Deadline

The deadline for submitting bids for the Purchased Assets and the EHSA Asset by a Qualified Bidder so as to be received by the Notice Parties shall be _____, 2009 at 11:00 a.m. (prevailing Boston, Massachusetts time) and _____, 2009 at 11:00 a.m. (prevailing Boston, Massachusetts time), respectively (the "Bid Deadline").  A bid received after the applicable Bid Deadline shall not constitute a Qualified Bid (as defined below).

No later than the applicable Bid Deadline, a Qualified Bidder that desires to make an offer to acquire the Purchased Assets or the EHSA Asset, as applicable, (a "Bid") shall deliver written copies of its Bid to the Notice Parties so as to be received by the applicable Bid Deadline.

## Determination of Qualified Bid Status

To be eligible to participate in the bidding process each prospective Qualified Bidder must deliver a written Bid to the Notice Parties so to be received by the applicable Bid Deadline, and that complies with each of the following conditions:

Marked Purchase Agreement: With respect to the Purchased Assets, a Bid shall be in the form of a black-lined copy of the Purchase Agreement showing the changes requested by the Bidder, including those related to the Purchase Price and other material terms such that the Debtor in its reasonable exercise of its business judgment may determine how such Bid compares to the terms of the Purchase Agreement.  With respect to the EHSA Asset, a Bid shall be in the form of a black-lined copy of a purchase agreement to be supplied by the Debtor to any Qualified Bidder that requests an EHSA form agreement showing the changes requested by the Bidder.  The Debtor in its reasonable exercise of its business judgment may determine how such Bid compares to the terms of the applicable purchase agreement and any other bids.  The Bidder shall also submit an executed "clean" copy of such Purchase Agreement.

Assets: The Debtor is considering Bids for the Purchased Assets and the EHSA Asset. Prospective Qualified Bidders may submit a "joint bid" for the Purchased Assets and the EHSA Asset, provided, however, that the identity of each person participating in such "joint bid" must be disclosed in the Bid, and such "joint bid" shall be subject to section 363(n) of the Bankruptcy Code.  Any "joint bid" shall contain separate consideration for the EHSA Asset and a separate purchase agreement.

Conditions/Contingencies: A Bid shall NOT be subject to material conditions or contingencies to closing, including without limitation obtaining financing, internal approvals or further due diligence; provided, however, a Bid with respect to the Purchased Assets may contain closing conditions set forth in the Purchase Agreement.

Authorization: A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors or governing body with respect to the submission, execution, delivery and closing.

Good Faith Deposit: Except for the Stalking Horse Bidder, each Bid shall be accompanied by a good faith deposit ("Good Faith Deposit").  With respect to the Purchased Assets, such Good Faith Deposit shall be in the amount of 10% of the cash consideration in each Bid plus the Expense Reimbursement of $150,000, in the form of a certified check or other form acceptable to the Debtor in its discretion.  With respect to the EHSA Asset, such Good Faith Deposit shall be at least $50,000, which amount shall be increased to 10% of the purchase price accepted at the EHSA Asset Auction, in the form of a certified check or other form acceptable to the Debtor in its discretion.  Each Good Faith Deposit will be deposited and held in escrow.

Minimum Bid Requirement for Purchased Assets: Each Qualified Bidder's Bid to acquire the Purchased Assets shall have an initial minimum bid requirement equal to the sum of: (i) the Purchase Price; (ii) the Expense Reimbursement; and (iii) the proposed Overbid Increment (as defined below) in the amount of $100,000.

Minimum Bid Requirement for EHSA Asset:  Each Qualified Bidder's Bid to acquire the EHSA Asset shall have an initial minimum bid requirement equal to $50,000.

Other Evidence: Each Bid must contain evidence satisfactory to the Debtor in its discretion that the bidder is reasonably likely (based upon availability of financing, experience and other considerations) to timely consummate a sale transaction if selected as the Successful Bidder (as defined below).

Irrevocable: A Bid must be irrevocable until two (2) business days after the closing of the sale or sales pursuant to an order of the Bankruptcy Court that is no longer subject to appeal, modification or reconsideration.

A Bid received from a Qualified Bidder on or before the applicable Bid Deadline that meets the above requirements, in the Debtor's discretion, shall constitute a "Qualified Bid."  In the event that a Bid is determined not to be a Qualified Bid, such Bidder shall be refunded its Good Faith Deposit within three (3) business days of that determination.

The Debtor shall transmit copies of all Bids to counsel for any Creditors Committee that may be appointed, and, with respect to Bids relating to the Purchased Assets, to the Stalking Horse Purchaser via facsimile, hand-delivery, overnight mail or electronic mail, promptly after receipt.

The Stalking Horse Purchaser is a Qualified Bidder with respect to the Purchased Assets and the Purchase Agreement is a Qualified Bid with respect to the Purchased Assets.

## **Expense Reimbursement**

The Debtor has agreed to pay the Stalking Horse Purchaser the Expense Reimbursement in accordance with the terms set forth in the Purchase Agreement.

## **"As Is Where Is"**

The sale of the Debtor's assets that are subject to the Motion shall be on an "as is, where is" basis without representations or warranties of any kind or nature, except to the extent set forth in the respective definitive purchase agreement(s) with the Successful Bidder (or Back-up Bidder). Except as may be set forth in the definitive purchase agreement(s), any and all of the Debtor's assets shall be sold free and clear of any and all liens, claims, security interests, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code, with such to attach to the net proceeds of sale in their order of priority.

## **Auction**

The Debtor shall conduct an auction (the "Purchased Assets Auction") to determine the highest and best bid for the Purchased Assets beginning at 10:00 a.m. (prevailing Boston, Massachusetts time) on _____ at the offices of Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, 29th Floor, Boston, MA 02210, or at such later time and at such other place as the Debtor shall notify all Qualifying Bidders and all other persons entitled to attend the Purchased Assets Auction.

The Debtor shall conduct an auction (the "EHSA Asset Auction") to determine the highest and best bid for the EHSA Asset beginning at 10:00 a.m. (prevailing Boston, Massachusetts time) on _____ at the offices of Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, 29th Floor, Boston, MA 02210, or at such later time and at such other place as the Debtor shall notify all Qualifying Bidders and all other persons entitled to attend the EHSA Asset Auction.

Only the Debtor, Qualified Bidders and such other persons expressly invited by the Debtor, including in each case their respective advisors, will be permitted to attend the Purchased Assets Auction and EHSA Asset Auction, as applicable. The Debtor and its advisors shall direct and preside over the Purchased Assets Auction and EHSA Asset Auction.

At the opening of the Purchased Assets Auction and EHSA Asset Auction, the Debtor shall announce the then highest and best bid for the Purchased Assets or the EHSA Asset, as applicable (the "Baseline Bid"), and the manner in which bidding on the Purchased Assets or EHSA Asset, as applicable, will proceed at the Purchased Assets Auction or EHSA Asset Auction, as applicable. Bidding thereafter shall be made on an open basis, on the record of the Purchased Assets Auction or EHSA Asset Auction, as applicable, and all material terms of each successive Bid shall be fully disclosed to all other Qualified Bidders (including the Stalking Horse Purchaser with respect to the Purchased Assets Auction) present at the Purchased Assets Auction or EHSA Asset Auction, as applicable.

The Debtor may announce at the Purchased Assets Auction and EHSA Asset Auction such additional rules that it believes reasonable and necessary to maximize the value of its estate, so long as such rules are not inconsistent with the Bid Procedures.

## Overbid Increment

Each Bid made at the Purchased Assets Auction for the Purchased Assets following announcement of the Baseline Bid will be in increments of $100,000 (the "Overbid Increment"); provided however, that if the Baseline Bid is not that of the Stalking Horse Purchaser, such Baseline Bid must be at least equal to the sum of: (i) the Purchase Price; (ii) the Expense Reimbursement; and (iii) the Overbid Increment.  In the event that the Stalking Horse Purchaser makes a subsequent bid, the Stalking Horse Purchaser's Overbid Increment requirement will be reduced by an amount equal to the sum of the Expense Reimbursement and the aggregate amount of any outstanding debtor-in-possession financing provided by the Stalking Horse Purchaser to the Debtor.

An overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtor accepts a higher Qualified Bid as an overbid.  The Debtor shall announce at the Purchased Assets Auction the material terms of each overbid and the basis for calculating the consideration offered in each such overbid.

The Debtor may establish such bidding increments as it deems reasonable in connection with the EHSA Asset Sale.

## Closing the Auction

At the conclusion of the bidding, the Debtor shall determine in the exercise of the Debtor's reasonable business judgment the highest and best bid for the Purchased Assets and may determine the highest and best bid for the EHSA Asset (each, the "Successful Bid").  With respect to the Purchased Assets Auction, such exercise of reasonable business judgment must include consideration of the Debtor's obligation to pay the Stalking Horse Purchaser the Expense Reimbursement if the Stalking Horse Purchaser is not the Successful Bidder.  The Debtor reserves the right to select the next highest or otherwise best offer after the Successful Bid as a back-up bid (the "Back-Up Bid") for the Purchased Assets and the EHSA Asset, as applicable. The Debtor may conclude that no bid for the EHSA Asset is acceptable and report the results of the EHSA Asset Auction at the Sale Hearing.

## Sale Hearing

The Debtor shall seek approval of the Successful Bid at the Sale Hearing to be conducted by the Bankruptcy Court on _____, 2009 with respect to the Purchased Assets and EHSA Asset, or, in each case, at such later date as may be established by the Bankruptcy Court.  The Debtor will not have accepted the Successful Bid with respect to the Purchased Assets unless and until the Bankruptcy Court has approved the Successful Bid at the Sale Hearing and entered the Sale Order.  The Debtor will not have accepted the Successful Bid with respect to the EHSA Asset unless and until the Bankruptcy Court has approved the Successful Bid at the Sale Hearing and entered a sale order approving the sale of the EHSA Asset in form acceptable to the Debtor.

## Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidders shall be applied to the purchase price of such transaction at Closing.  The Good Faith Deposit of the Back-up Bidder shall be held in an interest-bearing account until five (5) days after the Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-up Bidder.  Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after entry of the Sale Order, with respect to the Purchased Assets, and a sale order as described above, with respect to the EHSA Asset, and thereafter returned to the respective bidders.  If a Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Debtor shall be entitled to retain the Good Faith Deposit as part of its damages (subject to the terms of the Purchase Agreement) resulting from the breach or failure to perform by such Bidder.  The deposit provided by the Stalking Horse Purchaser shall be returned or applied in accordance with the terms of the Purchase Agreement.

## Miscellaneous Provisions

The Debtor reserves the right, in its discretion, to modify the Bid Procedures as the Debtor deems appropriate to obtain the highest and best Bid for the Purchased Assets and EHSA Asset, so long as such modification is consistent with the terms hereof, including the Bid Procedures.

The Debtor, in its discretion, subject to the Court's review if challenged by any interested party, may (a) determine which Qualified Bid, if any, is the highest and best offer for the Purchased Assets and EHSA Asset, and (b) reject at any time before entry of the Sale Order, with respect to the Purchased Assets, and a sale order as described above, with respect to the EHSA Asset, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtor, its estate, and creditors.

25.    The Debtor submits that implementation of the Bid Procedures will facilitate the

bidding for the Purchased Assets and the ESHA Asset.  The Debtor does not believe that at this

juncture, given its available liquidity and the need to sell its business and assets on an expedited

basis, the approval of the Bid Procedures will chill any bidding.  Rather, the Debtor respectfully

submits that approval of the Bid Procedures is in the best interests of the Debtor, its estate and its

creditors in that it provides a structure and format for all potentially interested parties to equally

formulate a bid for the Purchased Assets and ESHA Asset and participate in the sale process.

Importantly, the Bid Procedures enable the Debtor to entertain Bids in order to ensure its estate and creditors receive the highest and best possible price.

**D.**     ***The Expense Reimbursement and Overbid Increment***

26.     Subject to the terms of the Purchase Agreement, the Debtor seeks authorization to reimburse the Stalking Horse Purchaser its demonstrated out-of-pocket expenses in connection with the Purchased Assets Sale up to $150,000, in accordance with the terms and conditions of the Purchase Agreement.

27.     The obligation of the Debtor to pay Expense Reimbursement shall constitute an allowed administrative expense under section 503(b)(1) of the Bankruptcy Code.  To the extent a competing transaction is consummated, the Expense Reimbursement shall be paid out of the deposit given by the Successful Bidder (or Back-Up Bidder) free and clear of all Encumbrances without the need for further order of this Court.

28.     The obligation of the Debtor to pay the Expense Reimbursement shall be taken into account in the Debtor's determination of the highest and best bid in each round of bidding and in the amount of deposit required by the Debtor in connection with any bid.

29.     The Debtor also seeks authorization to require that any initial bids that seek to eclipse the Purchase Price shall provide consideration having a value, as determined by the Debtor, equal to the Purchase Price <u>plus</u> the Expense Reimbursement <u>plus</u> $100,000 (the "Overbid Increment").  The Overbid Increment ensures that the Debtor's estate will not be unnecessarily burdened with *de minimus* or bad faith bids.

30.     The Expense Reimbursement and Overbid Increment will work to maximize the value of the Debtor's estate by encouraging only those bids which are truly higher or better than the offer by the Stalking Horse Purchaser set forth in the Purchase Agreement.

**E.**        ***Notice of Auction and Sale Hearing, Bid Procedures and Objection Deadlines***

31.        To facilitate the Bid Procedures, the Debtor respectfully requests that the Court

schedule the Sale Hearing at the convenience of the Court, during the week of August 17, 2009

and set the Bid Deadlines, the Purchased Assets Auction and EHSA Asset Auction in advance

thereof.  Moreover, the Debtor respectfully requests that the Court approve the Notice of Auction

and Sale (as that term is defined below) and the Notice of Proposed Assumption and Assignment

and Cure Amount Notice (as defined below) to be issued in connection with the proposed

Purchased Assets Sale, in substantially the form of the notices attached as <u>Exhibit 2</u> and <u>Exhibit</u>

<u>3</u> to the Bidding Procedures Order.

**1.**        ***The Notice of Auction and Sale***

32.        Not later than three (3) days after the entry of the Bidding Procedures Order, the

Debtor will cause notice of the Purchased Assets Auction, EHSA Asset Auction and Sale

Hearing, in a form substantially similar to the form attached to the Bidding Procedures Order as

Exhibit 2 (the "Notice of Auction and Sale"), and a copy of the Bidding Procedures Order

approving the Bid Procedures in the form approved by this Court, to be sent by first-class mail,

postage-prepaid to: (i) counsel to the Creditors Committee, or in the event that no Creditors

Committee is appointed, the creditors holding the 20 largest unsecured claims against the

Debtor's estate; (ii) all parties to the Contracts and Leases; (iii) all parties that filed requests for

notices in this case; (iv) the governmental entities listed on Schedule 7.1 of the Purchase

Agreement; (v) the Office of the United States Trustee; and (vi) all entities that expressed in

writing the to the investment banker retained by the Debtor an interest in purchasing any of the

Purchased Assets.

33.     Except to the extent otherwise provided in the Bidding Procedures Order or by further order of the Court, the Debtor seeks authorization to serve any party in interest with notice of the Purchased Assets Auction, EHSA Asset Auction and Sale Hearing, orders, pleadings and notices by providing notice (the "Notice of Documents") to such parties that copies of such documents are available on counsel to the Debtor's website at www.craigmacauley.com in an area designated for pleadings and information in the Debtor's case.  The Debtor seeks approval of the Notice of Documents in substantially the form attached to the proposed Bidding Procedures Order as Exhibit 3.

### 2.     *Proposed Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases*

34.     To further facilitate the Purchased Assets Sale, the Debtor will serve, via first class mail, a notice (the "Notice of Proposed Assumption and Assignment and Cure Amount Notice"), in a form substantially similar to the form attached to the Bidding Procedures Order as Exhibit 4, not later than three (3) days after the entry of the Bidding Procedures Order on each counterparty to the Contracts and Leases.  As soon as practicable after an amendment to the Notice of Proposed Assumption and Assignment and Cure Amount Notice adding a Contract or Lease thereto (any such contract, an "Additional Contract"), the Debtor will serve notice (the "Additional Contract Notice") to each affected counterparty of the proposed assumption and assignment of the Additional Contract and of any Cure Costs associated therewith by overnight delivery service, facsimile, electronic transmission or by hand.

35.     The Debtor proposes to attach to the Notice of Proposed Assumption and Assignment and Cure Amount Notice its calculation of the undisputed cure amounts that it believes must be paid to cure all defaults or compensate for pecuniary losses under each Contract and Lease (the "Cure Cost").  If no amount is listed on the Notice of Proposed Assumption and

Assignment and Cure Amount Notice, the Debtor believes that there is no Cure Cost.  Unless the

non-debtor party files an objection (the "Cure Amount Objection") to its scheduled Cure Cost, or

on adequate assurance of further performance or any other grounds by the later of (a) the

objection date set by the Court in the Bidding Procedures Order and (b) in the case of an

Additional Contract, 4:00 p.m. (prevailing Boston, Massachusetts time) on the date that is five

business days following the Debtor's service of the Additional Contract Notice, and serves the

objection so that it is actually received before such deadline upon: (a) counsel to the Debtor,

Christopher J. Panos, Esq., Craig and Macauley Professional Corporation, Federal Reserve

Plaza, 600 Atlantic Avenue, Boston, MA 02110; and (b) counsel to the Stalking Horse

Purchaser, Joseph M. Witalec, Esq., Jones Day, 325 John H. McConnell Blvd., Columbus, OH

43215 and Douglas Rosner, Esq., Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, MA

02110, then the Debtor may assume and assign such Contract or Lease to the Successful Bidder

(or Back-up Bidder) with respect to the Purchased Assets and such non-debtor party shall: (i) be

forever barred from objecting to the Cure Cost and from asserting any additional cure, pecuniary

loss or other amounts with respect to such Contract or Lease, and the Debtor shall be entitled to

rely solely on the Cure Cost; (ii) be forever barred from objection to the assumption and

assignment of a Contract or Lease to the Successful Bidder (or Back-up Bidder) on adequate

assurance of future performance or any other grounds; (iii) be forever barred and estopped from

asserting or claiming against the Debtor, the Stalking Horse Purchaser or any other Successful

Bidder (or Back-up Bidder) or any other assignee of the relevant Contract or Lease or any

successor or assignee thereof that any additional amounts are due or defaults exist under such

Contract or Lease; and (iv) be deemed to have consented to the assumption and assignment of

such Contract or Lease.

36.     Moreover, unless the non-debtor party files a Cure Amount Objection on a timely

basis pursuant to and in accordance with the requirements set forth above, such non-debtor party

shall be deemed to have been provided with adequate assurance of future performance under the

applicable Contract or Lease, and shall be forever barred from raising any defense, claim, or

objection with respect to the assignment of such Contract or Lease on account of the financial

condition of the Stalking Horse Purchaser or any other Successful Bidder (or Back-up Bidder).

37.     If a Cure Amount Objection is timely filed, the Cure Amount Objection must set

forth: (a) the basis for the objection; (b) with specificity, the amount the party asserts as the Cure

Cost; and (c) the documentation relied upon in support of the asserted Cure Cost.  In addition,

any Cure Amount Objection shall contain an email address for counsel to the objecting party to

be served with further notices or information.

38.     Hearings on Cure Amount Objections (and objections to the adequate assurance of

future performance under the Contracts and Leases to be assumed and assigned to the Stalking

Horse Purchaser or any other Successful Bidder, which must be raised in accordance with the

procedures below) may be held (a) at the Sale Hearing, or (b) on such other date the Court

directs; provided, however, that if a Contract or Lease is assumed and assigned, the Cure Cost

asserted by the objecting party (or such lower amount as may be fixed by the Court) shall be

deposited and held in a segregated account by the Debtor pending further order of the Court or

mutual agreement of the parties.  At the hearings on Cure Amount Objections, the Court will

consider evidence necessary to determine any factual issues relating thereto.

39.     If a Purchased Assets Auction is conducted and the Successful Bidder is a party

other than the Stalking Horse Purchaser, the Debtor shall cause a notice identifying the

Successful Bidder to be sent by electronic transmission or overnight courier to all parties to the Contracts and Leases within one (1) day of the conclusion of the Purchased Assets Auction.

40.    If the Stalking Horse Purchaser is not the Successful Bidder for the Purchased Assets, and such Successful Bidder is seeking to have the Contracts and Leases assumed and assigned as part of its Bid, the Debtor will provide financial information for the Successful Bidder to all non-debtor parties to such Contracts and Leases within one (1) day of the conclusion of the Purchased Assets Auction by electronic transmission or overnight courier.

41.    The Debtor's decision to assume and assign the Contracts and Leases shall be subject to Court approval and consummation of the Purchased Assets Sale.  Absent consummation of the Purchased Assets Sale, each of the Contracts and Leases shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

42.    Except to the extent otherwise provided in the Purchase Agreement, or the definitive purchase agreement with the Successful Bidder (or Back-up Bidder) of the Purchased Assets, the assignee of any Contract or Lease will not be subject to any liability to the counterparty of the assigned Contract or Lease that accrued or arose before the closing date, and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

### 3.    The Sale Hearing and Objection Deadline

43.    Subject to the Court's calendar, the Debtor respectfully requests that the Sale Hearing be scheduled on or about the week of August 17, 2009, with an objection deadline for such Sale Hearing set for five (5) business days prior to the date scheduled for the Sale Hearing.

44.     The Debtor requests that objections, if any, to the Purchased Assets Sale or the

EHSA Asset Sale or the proposed assumption and assignment of any Contract or Lease,

including any objections based upon lack of adequate assurance of future performance under

sections 365(b)(1)(C) or (f) of the Bankruptcy Code, must: (a) be in writing; (b) comply with

Bankruptcy Rules and Local Bankruptcy Rules; and (c) be filed no later than the time set for

objections in the Bidding Procedures Order with the Clerk of the Bankruptcy Court and be

served upon counsel to the Debtor, Christopher J. Panos, Esq., Craig and Macauley Professional

Corporation, Federal Reserve Building, 600 Atlantic Avenue, Boston, MA 02210 and counsel to

the Stalking Horse Purchaser, Joseph M. Witalec, Esq., Jones Day, 325 John H. McConnell

Blvd., Columbus, OH 43215 and Douglas Rosner, Esq., Goulston & Storrs, P.C., 400 Atlantic

Avenue, Boston, MA 02110.

45.     In addition, the Debtor requests that if the Stalking Horse Purchaser is not the

Successful Bidder for the Purchased Assets, and the Successful Bidder (or Back-up Bidder) is

seeking to have Contracts or Leases assumed and assigned as part of the Purchased Assets Sale,

the non-debtor parties to such Contracts and Leases shall have until 4:00 p.m. on the day prior to

the Sale Hearing to raise objections under sections 365(b)(1)(C) or (f) of the Bankruptcy Code.

46.     The failure of any person to timely file its objection shall be a bar to the assertion,

at the Sale Hearing, or thereafter, of any objection to the consummation of the Purchased Assets

Sale and EHSA Asset Sale, as applicable, free and clear of any and all Encumbrances (other than

permitted encumbrances provided for expressly in the Purchase Agreement or alternative

purchase agreement entered into with the Successful Bidder or Back-up Bidder) or the Debtor's

assumption and assignment of any Contract or Lease.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.      *The Bid Procedures and Expense Reimbursement Should be Approved***

47.      Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As described above, approval of the Bid Procedures will greatly assist the Debtor in maximizing value that it may obtain for the Purchased Assets and EHSA Asset.  Consequently, the Debtor respectfully submits that granting the requested relief is "appropriate" under the circumstances.

48.      Once a debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (internal quotation marks and citation omitted).  *See also Committee of Asbestos-Related Litigants v. Johns-Manville Corp. ( In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions" (citations omitted)).

49.      When applying the "business judgment" rule, courts show great deference to the debtor's decision-making.  *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).

**1.      *The Bid Procedures Are Appropriate***

50.      The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtor's estate.  The proposed procedures contain terms

typical for a process through which a sale as contemplated herein is consummated, and the

adoption of the Bid Procedures represents a sound exercise of the Debtor's business judgment.

51.    As described in detail above, the Debtor has limited funding and resources

available to it to sustain an extended period in bankruptcy.  While the Debtor has undertaken

efforts to reduce expenses and stabilize its business, the Debtor does not have the resources to

continue operating beyond the period contemplated by the Bid Procedures without additional

funding, of which the Debtor has no assurance.  Absent the sale of its assets, the Debtor is

unlikely to realize value for the benefit of its stakeholders.  For these reasons, the Debtor, in

consultation with its professionals, has determined that the best option for maximizing the value

of its estate for the benefit of creditors and other constituencies is through a sale process pursuant

to the Bid Procedures

52.    The Debtor believes that the Bid Procedures establish the parameters under which

the value of the Purchased Assets and EHSA Asset may be maximized.  Such procedures will

unquestionably increase the likelihood that the Debtor will receive the greatest possible

consideration for such assets because they will ensure a competitive and fair bidding process.

### *2.    The Expense Reimbursement and Overbid Increment Are Appropriate*

53.    The Debtor submits that the Expense Reimbursement and Overbid Increment

should be approved as they will encourage bidding rather than chill it.  Historically, bankruptcy

courts have approved bidding incentives similar to the Expense Reimbursement and Overbid

Increment offered here under the "business judgment rule," which proscribes judicial second-

guessing of the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Associates, L.P.,* 96 B.R. 24, 28

(Bankr. S.D.N.Y. 1992) (bidding incentives may be "legitimately necessary to convince a white

knight to enter the bidding by providing some form of compensation for the risks it is

undertaking" (citation omitted)); *In re Marrose Corp.,* Case Nos. 89 B 12171-12179 (CB), 1992

WL 33848 at *5 (Bankr. S.D.N.Y. 1992) (bidding incentives are "meant to compensate the

potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable

offers").

54.     The Expense Reimbursement meets the "business judgment rule."  Bidding

incentives such as the Expense Reimbursement encourage a potential purchaser to act as a

"stalking horse" in the context of a bankruptcy sale, that is, to invest time, money and effort to

negotiate with a debtor despite the inherent risks and uncertainties of the chapter 11 process.

The Expense Reimbursement provides potential purchasers with a bench mark against which to

bid and will enable them to submit their own adaptation of the Purchase Agreement to make a

bid.  Likewise, the Debtor's estate has been benefited by the "floor" price established by the

Stalking Horse Purchaser for the Purchased Assets in the Purchase Agreement.  Additionally, the

Debtor believes that providing these incentives to the Stalking Horse Purchaser will enhance

prospects for spirited bidding on the Purchased Assets.

55.     Similarly, the Overbid Increment requirements described in the Bid Procedures

are appropriate under the circumstances.  The Debtor submits that the requirements reflect rather

modest minimum overbid requirements given the magnitude, complexity and scope of the

Debtor's business and the Purchased Assets, and the Debtor believes that the requirements are

unlikely to deter serious bidders.  Consequently, the Debtor believes that the Overbid Increment

is appropriate.

56.     Absent authorization of the Expense Reimbursement and the Overbid Increment,

the Debtor may lose the opportunity to obtain the highest and best offer for the Purchased Assets.

If the protections are not approved, the Stalking Horse Purchaser may not go forward with the Purchased Assets Sale.

57.     The Debtor therefore respectfully requests that the Expense Reimbursement and Overbid Increment be approved and that the Court authorize the payment of the Expense Reimbursement.

**B.     *The Sale of the Debtor's Assets is Within the Sound Business Judgment of the Debtor and Should be Approved***

58.     The Bankruptcy Code provides for the sale of a debtor's assets out of the ordinary course of business.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  Moreover, the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).  Courts interpreting section 363(b)(1) have approved such sales (including such sales by a debtor-in-possession through the application of section 1107 of the Bankruptcy Code) so long as the decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor, even where substantially all of a debtor's assets were being sold prior to proposal of a plan of reorganization.  *In re Lionel Corporation,* 722 F.2d 1063, 1070-71 (2nd Cir. 1983); *In re Baldwin United Corp.,* 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); In Re Allison, 39 B.R. 300, 301 (Bankr. D.N.M. 1984); *In re St. Petersburg Hotel Association Ltd.,* 37 B.R. 341, 343 (Bankr. N.D. Fla. 1983).

59.     In this case, the Debtor submits that the decision to proceed with the sale of the Debtor's assets, and the Bid Procedures related thereto, are based upon its sound business judgment and should be approved.  For the reasons set forth above, the Debtor believes that it is essential to sell its assets promptly.  Simply put, given the circumstances facing the Debtor as a

result of its liquidity position, it is necessary to promptly sell its assets to avoid deterioration in their value.  The Debtor believes that the Bid Procedures, the Purchased Assets Auction and the EHSA Asset Auction will generate interest and bidding, and the bidding process will yield the highest and best bid for the Purchased Assets and the EHSA Asset.  Accordingly, the Debtor believes that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of the Debtor's estate for the benefit of its stakeholders.

C.      ***The Sale of the Debtor's Assets Will Satisfy the Requirements of Section 363(f) of the Bankruptcy Code***

60.      The Debtor requests authority to sell the Purchased Assets and EHSA Asset free and clear of liens, claims, charges, security interests, restrictions and encumbrances of any kind or nature (collectively, "Encumbrances") to the fullest extent permitted by the Bankrputcy Code, with such Encumbrances, if any, to attach to the net proceeds of the Purchased Assets Sale or EHSA Asset Sale, as applicable.  Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if one of the following conditions is satisfied: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such lien, claim or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate value of all liens on the property; (d) the interest is subject to a bona fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

61.      To the extent necessary, the Debtor expects that it will satisfy one or more of such conditions at the Sale Hearing.  The Debtor does not believe that any entity will assert a lien covering any asset proposed to be sold.

62.     Further, applicable case law provides that section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching to the net proceeds of the sale.  *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the sale."); *In re WPRV-TV, Inc.,* 143 B.R. 315, 321 (D.P.R. 1991); *In re Elliot,* 94 B.R. 343, 345 (E.D. Pa. 1988).

**D.      "Good Faith" under Section 363(m) of the Bankruptcy Code**

63.     The Debtor requests that the Court find that the Successful Bidder (or any Back-Up Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankrputcy Code.

64.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) and (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

65.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

66.     Although the Bankruptcy Code does not define "good faith," the First Circuit, in *Geylock Glen Corp. v. Community Savings Bank*, has utilized the traditional equitable definition of good faith requiring that a purchaser provide value in good faith, and without knowledge of

adverse claims.  656 F.2d 1, 4 (1st Cir. 1981); *Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.),* 98

B.R. 609, 618 (D. Mass. 1989).

      67.    Here, the sale of the Purchased Assets and the EHSA Asset and the assignment of

the Contracts and Leases will be in good faith.  The record made at the Sale Hearing will

demonstrate the absence of fraud or collusion in connection with the sale of the Purchased Assets

and EHSA Asset and the assignment of the Contracts and Leases.  As discussed throughout this

Motion, and as will be confirmed at the Sale Hearing, the Purchase Agreement (or the

comparable asset purchase agreement with the Successful Bidder) will be the culmination of a

solicitation and negotiation process in which all parties will be represented by counsel.  All

negotiations have been and will continue to be conducted on an arms length, good faith basis.

With respect to potential bidders, the Bid Procedures are designed to ensure that no party is able

to exert undue influence over the process.  Moreover, the identities of the parties participating in

the bidding will be disclosed to the Debtor, any Creditors Committee and the Court, and such

bids are subject in all respects to section 363(n) of the Bankruptcy Code.  Under the

circumstances, the Successful Bidder (or Back-up Bidder) should be afforded the protections that

section 363(m) of the Bankruptcy Code provides to a good faith purchaser.  Further, the Bid

Procedures are designed to prevent potential bidders from engaging in conduct that would cause

or permit the sale of the Debtor's property to be avoided under section 363(n) of the Bankruptcy

Code.

**E.**      ***The Assumption and Assignment of the Contracts and Leases Should be Approved***

      68.    To facilitate and effectuate the sale of the Purchased Assets, the Debtor seeks

authority to assume and assign the Contracts and Leases to the Stalking Horse Purchaser or any

other Successful Bidder (or Back-up Bidder) to the extent required.

69.     Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume

and/or assign its executory contracts and unexpired leases, subject to the bankruptcy court's

approval.  Section 365 provides, in pertinent part, that:

> [e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c) and
> (d) of this section, the trustee, subject to the court's approval, may assume or reject any
> executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

70.     Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired

lease or executory contract of a debtor, and provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the
> debtor, the trustee may not assume such contract or lease unless, at the time of
> assumption of such contract or lease, the trustee -
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure,
> such default other than a default that is a breach of the provision relating
> to the satisfaction of any provision (other than a penalty rate or penalty
> provision) relating to a default arising from a failure to perform
> nonmonetary obligations under an unexpired lease of real property, if it is
> impossible for the trustee to cure such default by performing nonmonetary
> acts at and after the time of assumption, except that if such default arises
> from the failure to operate in accordance with a nonresidential real
> property lease, then such default shall be cured by performance at and
> after the time of assumption in accordance with such lease, and pecuniary
> lessee resulting from such default shall be compensated in accordance
> with the provision of this paragraph;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly
> compensate, a party other than the debtor to such contract or lease, for any
> actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or
> lease.

11 U.S.C. § 365(b)(1).

71.     The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical pragmatic construction."  *See*

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J.

1989); *see also In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill.

1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").  The Debtor submits that the cure

procedures provided in this Motion, bidder qualification provided in the Bid Procedures and the

arms-length nature of any transaction approved by this Court pursuant to the Purchased Assets

Auction support the position that the requirements set forth in section 365(b)(1) will be satisfied

under the contemplated Purchased Asset Sale.

72.     Courts have applied the "business judgment" standard to determine whether the

assumption is in the debtor's economic best interests. *Sharon Steel Corp. v. National Fuel Gas

Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enterprises,

Inc.* V, 183 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference

to a debtor's decision to assume or reject a contract. A debtor need only show that its decision to

assume or reject the contract is an exercise of sound business judgment – a standard which we

have concluded many times is not difficult to meet." (citations omitted)).

73.     The Stalking Horse Purchaser or any other Successful Bidder (or Back-up Bidder)

for the Purchased Assets may desire to take assignment of the Contracts and Leases as they relate

to the Purchased Assets.  To the extent the Contracts and Leases are identified for assumption

and assignment, the Debtor believes that it can and will demonstrate that all requirements for

assumption and/or assignment will be satisfied at the Sale Hearing., including, if for no other

reason, because such assumption and assignment is integral to a transaction resulting in the

realization of value to the Debtor's estate.  The Debtor, as required by the Bid Procedures, will

evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid.

Further, for the reasons stated throughout this Motion, the Debtor, in the exercise of its sound business judgment, believes that selling the Purchased Assets and assuming and assigning the Contracts and Leases attendant to the operation of the Purchased Assets will be in the best interests of its estate.

74.     The Debtor does not believe that any of the Contracts or Leases will contain provisions which purport to limit the assignment of the individual agreement.  Nonetheless, out of an abundance of caution, because, as set forth below, the Bankruptcy Code provides that such provisions are either unenforceable or may be satisfied by other means established under the Code or applicable law, the Debtor requests that the assumption and assignment of the Contracts and Leases be permitted without regard to such provisions should they exist.

75.     The assumption and assignment of an executory contract or unexpired lease may be achieved without the need for curing any default therein triggered by the insolvency of the debtor, the commencement of bankruptcy proceedings, the appointment of a trustee or a penalty provision triggered by the debtor's failure to perform nonmonetary provisions. *See* 11 U.S.C. § 365(b)(2)(A)-(D).

76.     In addition, section 365(f) of the Bankruptcy Code provides that "[e]xcept as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2)" of section 365(f).  *See* 11 U.S.C. § 365(f).

77.     The Debtor requests that, in satisfaction of section 365(f), to the extent permitted under section 365 (b) and (c) of the Bankruptcy Code, the Contracts and Leases be assumed and assigned to the Stalking Horse Purchaser or any other Successful Bidder (or Back-up Bidder) with

the Cure Amount as identified in the Exhibit A to the Notice of (i) Proposed Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (ii) Amounts Necessary to Cure Defaults.  The Debtor further submits that at the Sale Hearing, in conjunction with any required showing of good faith under section 363(m), it will demonstrate, under paragraph (2) of section 365(f), "adequate assurance of future performance" by the Stalking Horse Purchaser or any other Successful Bidder (or Back-up Bidder) for any party objecting to the proposed assumption on these grounds and that the assumption and assignment is not otherwise prohibited under §365(b) and (c).

78.    To the extent that a non-debtor party to a Contract or Lease fails to object to the assumption and assignment of its Contract or Lease or the Cure Amount with respect thereto, the Debtor requests that such party be deemed to have consented to the assumption and assignment and Cure Amount.  *In re Tabone, Inc.,* 175 B.R. at 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent).  Moreover, the Debtor requests that, to the extent that no objection is received, each such party be deemed to consent to the assumption and assignment of its Contract or Lease notwithstanding any anti-alienation provision or other restriction on assignment. *E.g.,* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

79.    Finally, pursuant to section 365(k), the Debtor requests that its estate be relieved from any further liability with respect to the Contracts and Leases after assumption and assignment to the Successful Bidder (or Back-up Bidder).  *See* 11 U.S.C. § 365(k).

**F.    *Relief from the Ten (10) Day Stays under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate***

80.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the

trustee to assign an executory contract or unexpired lease…is stayed until the expiration of 10

days after then entry of the order, unless the court orders otherwise." The Debtor requests that

the Sale Order, upon its entry, be effective immediately by providing that the ten (10) day stays

under Bankruptcy Rules 6004(h) and 6006(d) are waived.

81.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented. See Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the ten (10) day stay period, one leading commentator

suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction

to close immediately "whether there has been no objection to the procedure." 10 *Collier on*

*Bankruptcy* ¶ 6064.09 (15th ed. rev.). Furthermore, the commentator states that if an objection is

filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may

be reduced to the amount of time actually necessary to file such appeal. *Id.*

82.    Accordingly, the Debtor hereby requests that the Court waive the ten (10) day stay

period under Bankruptcy Rules 6004(h) and 6006(d).

## **COMPLIANCE WITH MLBR 6004-1(A)(1)(A)**

83.    The Debtor has focused on the need to market its assets for sale with the goal of

maximizing the value for the benefit of the Debtor's estate and creditors. The Stalking Horse

Purchaser has proposed to purchase substantially all of the Debtor's assets exclusive of the

EHSA Asset. As stated above, the Debtor intends to solicit bids for the EHSA Asset. The

Debtor has engaged in a prepetition effort to identify buyers for its assets and has utilized the

services of an investment banker to identify and negotiate with potential buyers and to obtain the

offer from the Stalking Horse Purchaser.  The Debtor had also retained the services of a broker to

market the EHSA Asset.  If the Purchased Assets Sale closes to the Stalking Horse Purchaser in

mid-August, the Debtor projects that such sale will result in proceeds of $2.6 million to the

Debtor's estate.  Based on its records and a UCC lien search, the Debtor does not believe that

any party may properly assert a lien with respect to those proceeds.  The Debtor projects that

accrued administrative expenses for that period will exceed its cash on hand as of the Petition

Date by approximately $500,000 and that it may incur an additional $100,000 to $200,000 in

administrative expenses in connection with liquidating its remaining assets, resolving claims

against the estate, and confirming a plan of liquidation.  These projections are preliminary and

could be adjusted upward or downward depending on issues that arise when claims are filed or

otherwise in connection with these proceedings.  The Debtor's schedules reflect approximately

$1,750,000 in unsecured trade and customer-related indebtedness.  The Debtor also anticipates

approximately $1,015,000 in claims arising from rejected employment agreements that will be

subject to the cap set forth in section 502(b)(7) of the Bankruptcy Code.  The Debtor also

anticipates the assertion of several claims that have been the subject of litigation and, in some

cases, counterclaims by the Debtor.  There could also be rejection damages claims, although the

Purchase Agreement currently contemplates assumption and assignment of the Debtor's most

substantial executory contracts.  If the Debtor does not sell the EHSA Asset as part of the auction

process in the course of its Chapter 11 case, the Debtor currently contemplates transferring such

asset to a trust for the benefit of its creditors (to the extent that all claims have not been satisfied)

and its equity holders.

## NOTICE AND PRIOR RELIEF

84.     Notice of this Motion (and exhibits hereto) has been given via electronic mail transmission, facsimile, overnight mail hand delivery or first-class mail to the Office of the United States Trustee and the top twenty (20) general unsecured creditors of the Debtor.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

85.     No previous request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter: (i) enter an order, substantially in the form attached hereto as Exhibit A, approving the Bid Procedures; (ii) enter an order, substantially in the form attached hereto as Exhibit B, approving the sale of the Purchased Assets to the Stalking Horse Purchaser or any other Successful Bidder (or Back-up Bidder) consistent with this Motion; and (iii) granting such further and other relief as the Court deems just and proper.

Respectfully Submitted,

BIOPURE CORPORATION,

By its Attorneys,

July 16, 2009                    /s/ Christopher J. Panos
                                 Christopher J. Panos (BBO# 555273)
                                 Kathleen A. Rahbany (BBO# 654322)
                                 Craig and Macauley
                                     Professional Corporation
                                 Federal Reserve Plaza
                                 600 Atlantic Avenue
                                 Boston, Massachusetts  02210
                                 (617) 367-9500
                                 fax (617) 742-1788